### ELLIOTT CO. v. H. S. B. W. COCHRANE CORPORATION.

Circuit Court of Appeals, Third Circuit.
September 30, 1929.

Rehearing Denied October 17, 1929.

No. 3976.

Buffington, Circuit Judge, dissenting.

---

Byrnes, Stebbins & Parmelee, of Pittsburgh, Pa. (Clarence P. Byrnes and Earle L. Parmelee, both of Pittsburgh Pa., of counsel), for appellant.

Michael A. Foley, of Philadelphia, Pa. (Thomas G. Haight, of Jersey City, N. J., and John E. Hubbell and W. Brown Morton, both of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The bill charged the defendant with infringing two original and one re-issued United States Letters Patent granted to W. S. Elliott for apparatus and method to deaerate water. From the decree dismissing its bill the plaintiff appealed.

The court found claims of Letters Patent No. 1,457,153 for apparatus and claims of Letters Patent No. 1,497,491 for improvement in method not infringed. The Re-Issue Patent No. 15,866 is a re-issue of original patent No. 1,321,999 for a method granted on an application filed March 31, 1915, and later divided. The court held it invalid as against the defendant on findings that (1) the claims relied on are not for the same invention set forth in the original; (2) delay in applying for re-issue; (3) the claims were broadened by the re-issue; and (4) between the issuance of the original patent and the re-issue the defendant had acquired rights in the subject-matter of the patent. (D. C.) 26 F.(2d) 815.

It had long been known that ordinary steam and water carry air and other gases in varying quantities and that when steam or water with its occluded gases comes in contact with a boiler, its valves, pipe and fittings, corrosion inevitably follows. The low pressure cast iron boiler plants of early days were not so susceptible to corrosion, though corrosion occurred and the problem was met in various ways. But with the advent of great modern central power plants with boilers made of steel to meet the demand for higher pressure, corrosion became greater, cost of maintenance increased and efforts to stay the injury became more general among inventors. The aim of all has been completely to deaerate water so that when it should come in contact with the metal of a boiler, the corrosive elements of oxygen in free air being absent, the boiler would be preserved. Many inventors, including the patentee, sought to remove air from water by mechanical or physical means as distinguished from removal by chemical means and in doing this they resorted to known physical data and particularly to the laws of Henry and Dalton relating to partial pressure and solubility of gases and liquids which they adapted in different ways but nearly always by recognizing a heating stage and establishing a heating chamber whence the heated water is brought into a second stage on being fed into a second chamber of lower pressure and lower temperature where immediately upon entering the latter region the heat is released and the water sometimes undergoes a sudden ebulition and always a change of phase, liberating its imprisoned gases. This may result in the flash type, or, the steam being carried in pipes and thus kept away from the water, may cause a less sudden though very complete change of phase. Also the heat of the outgoing gases was sometimes recovered and saved by passing the gases through a condensor and causing their heat to be transmitted to the new cool water flowing through pipes into the system for treatment. The plaintiff, the defendant and many others at the time of the issuance of the patents and of the alleged infringements, and long before, had with many variations been working along these lines.

This is all we shall say about the art and about the main theory of the patented inventions for we find ourselves in full accord with the reasoning and conclusions of the learned trial judge, and were it not for one line of argument, ably presented and vigorously stressed on appeal, which as indicated by the silence of the judge's opinion on the point may not have been brought to his attention and pressed for decision, we should dispose of this appeal by adopting his opinion as our own. But the parties (the only persons conceivably interested) are entitled to have this matter discussed and decided in view of the presence of evidence on which it is based. In doing so we shall write this opinion as though it were a supplement to that of the learned trial judge and by reference to his opinion avail ourselves of his statement of the case, the art, and the law. (D. C.) 26 F.(2d) 815.

Addressing itself to what it regards as an outstanding feature of the inventions, the plaintiff says Elliott saw that the two stages must not only be obtained but must also be continuously maintained and controlled and that this continuous control must be kept in step with or proportioned to every demand of the apparatus in these several particulars:

(1) Operation must be continuous, the water flowing continuously through the deaerating apparatus under a continuous but variable demand.

(2) The successive portions of the water

must be progressively subjected to the temperature and pressure conditions of the separate stages.

(3) Since huge amounts of water must be deaerated rapidly it is necessary to distribute, spread it out or cascade it under proper conditions of temperature and pressure.

(4) The atmosphere above the water must be continuously withdrawn, as distinguished from intermittent or pulsating withdrawal, to prevent an "airbound" condition.

(5) Elliott, realizing that the mingled steam, air and gases making up the atmosphere above the water contain a large amount of heat which if not caught and saved would be lost and wasted, provided a heat interchange apparatus by which the heat of this withdrawn atmosphere is transferred to the new cool water passing into the deaerator to be treated.

(6) That the deaerated water should be kept out of contact with the air or an atmosphere containing air on its way from the deaerator to the point of use.

And, finally, (7) Elliott accomplished all this by automatically supplying water and heat, in accordance with the continuous but varying demands for air-free water upon the deaerator, the entering water being preferably fed through the steam atmosphere above the water in the pressure stage.

The plaintiff then described the Elliott invention as a new "combination" which, functioning as above, comprises two separate stages of treatment:

(1) A heating stage; and (2) a separate pressure stage—combined with an automatic regulating surface vent condensor and a float control valve—"the key feature of the combination."

Whatever at the argument may have been our nebulous impressions of invention involved in the sequence of stages in their specific arrangement with their different functions, this representation of a combination of possibly old stage elements with a new means of control arrested our attention and suggested the need of very careful consideration. When we came to study this particular aspect of the case we found that the plaintiff admitted (what is quite true) that the first stage is practically an old feed water heater which heats the water to within two to five degrees of steam temperature and that the hot water then passes to the second or pressure stage wherein air is eliminated in the substantially pure steam atmosphere. This, too, was not new except perhaps in the specific structure. It then represented that "the third element (automatic regulating means) recovers heat from one of the stages, supplies such heat to the water entering the first stage, prevents air binding and reabsorbing of released air, and co-operates with the float valve and first stage to automatically supply liquid and heat in accord with the demand for deaerated water and to control the temperature and pressure conditions." When thus stated and read it would seem that this means has high inventive merit, or is at least inventively useful, but all this can be translated and compressed into two words—a "vent condensor."

Now a vent condensor is old in the art and has appeared in different forms as an element in too many patented deaerating structures and methods to mention. Its function is accurately described by its name. It is a vent or a means by which the hot liberated air and gases are vented or drawn off from the chamber of the second stage, carried around a battery of pipes or other means through which cold aerated water is ascending to be deaerated, to which of course the hot air and gases transmit their heat and in doing which they are of course condensed and thence drawn out of the system. If the vent condensor thus described should, unaided and by itself, possess an inductive quality which would induce the highly steamed air to pass out of the system and in addition perform the functions of regulating temperature and pressure, water inflow and outflow attributed to it as above, and if it were the first to do these things, we can readily see how it might be invention. But as we understand a vent condensor, that instrumentality standing alone and without the aid of other instrumentalities does nothing of the kind, for Elliott regulated the internal conditions of the system first by a float valve within the lower chamber and next by a pump outside of and beyond the vent condensor, the condensor itself being outside the chamber. Thus it appears that these variables are not automatically regulated by the vent condensor or by any inductive quality of its own but in the first instance by the float valve and in the second by the pump. If there is anything automatic in the operation of the float valve, manifestly it is not invention because of the common use that float valves have attained in many arts. One type is familiar to every householder. Nor would there be an inductive or drawing off feature of the vent condensor without the connected pump. It is hardly invention to use a pump to draw off water or air either directly or indirectly. If the float valve were taken out of the lower chamber and the pump detached from the

vent condensor, we surmise that the vent condensor would have no regulatory characteristics and that what venting it did would be only such as would occur by reason of the fact that the pressure in the lower chamber is greater than the atmospheric pressure outside.

We are of opinion that both plaintiff and defendant used vent condensors (differently arranged) for the same purpose for which vent condensors had long been used in connection with water heaters and condensor air pumps and that Elliott's different arrangement does not involve invention, for, as the plaintiff admitted in advertising its type M apparatus that it was useful alike with and without the vent condensor, the instrument, even with its float valve and pump connections, can hardly be regarded "the key feature" of an inventive combination.

Having studied this by no means simple art and considered all other aspects of the inventions of the patents in suit, we stand with the trial court and direct that the decree be

Affirmed.

BUFFINGTON, Circuit Judge, dissents.